1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

THOMAS WELTER, an individual; and
ROB STUART, an individual,

                          Plaintiffs,

          v.

MICHAEL HURT, an individual;
CARAVAN HOLDINGS
CORPORATION D/B/A OASIS
CANNABIS COMPANY, a Nevada
corporation; CARAVAN HOLDINGS
LLC, a Wyoming limited liability
company; and DOES 1 to 50, inclusive,

                          Defendants.

Case No. 2:23-cv-02627-SPG-MAR

**ORDER GRANTING PLAINTIFFS'
MOTION FOR DEFAULT
JUDGMENT [ECF NO. 158]**

Before the Court is the Motion for Default Judgment (ECF No. 158 ("Motion")) filed by Plaintiffs Thomas Welter ("Welter") and Rob Stuart ("Stuart," or, together with Welter, "Plaintiffs"). The Court has read and considered the Motion and concluded that it is suitable for decision without oral argument. *See* Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15. Having considered the parties' submissions, the relevant law, and the record in this case, the Court GRANTS the Motion.

-1-

# I.    BACKGROUND

## A.    Factual Background

The following allegations are taken from Plaintiffs' First Amended Complaint ("FAC").  (ECF No. 100 ("FAC")).  Defendant Caravan Holdings Corporation d/b/a Oasis Cannabis Company LLC ("Caravan Corporation") is a Nevada corporation, with its principal place of business in Los Angeles, California.  (*Id.* ¶ 3).  Caravan Corporation is engaged in the production and sale of cannabis products in California.  (*Id.* ¶ 4).  Defendant Caravan Holdings LLC ("Caravan LLC") is a Wyoming limited liability company, which holds certain property in Santa Cruz, California.  (*Id.* ¶¶ 5, 66).  Defendant Michael Hurt ("Hurt," or, together with Caravan Corporation and Caravan LLC, "Defendants") is an individual residing and doing business in Los Angeles, California.  (*Id.* ¶ 6).  Hurt is the CEO and sole or majority shareholder of Caravan Corporation and the owner or co-owner of Caravan LLC.  (*Id.* ¶¶ 7-8).  Plaintiffs allege that Caravan Corporation and Caravan LLC are alter egos of Hurt.  (*Id.* ¶ 11).

Plaintiffs are investors in Caravan Corporation.  Between August 2020 and March 2022, in exchange for promissory notes, Welter provided Caravan Corporation with four loans, totaling $500,000 at 14% interest.  (*Id.* ¶¶ 19-22).  Welter also introduced Stuart to Caravan Corporation, and Stuart executed promissory notes of his own in December 2021 and February 2022 for an additional $500,000.  (*Id.* ¶¶ 26, 28-29).  Under the terms of the promissory notes, Plaintiffs were entitled to monthly interest payments and to repayment of the principal after two years.  (*Id.* ¶ 32; ECF No. 100-1 at 7).  The promissory notes provided that, upon Defendants' failure to pay or perform any other obligation, Plaintiffs could declare any outstanding interest and principal immediately due.  (FAC ¶¶ 33-34).  The promissory notes also gave Plaintiffs the option to convert the outstanding principal and interest into common stock at any time.  (ECF No. 100-1 at 9).  On August 22, 2022, Welter exercised this right, converting 50% of one of the $100,000 promissory notes into shares of Caravan Corporation's common stock, (FAC ¶ 23), though Welter asserts that he

never received any document reflecting this equity interest, (ECF No. 158-3 ("Welter Declaration") ¶ 6).

While Defendants initially made the required interest payments, Defendants began to make late or incomplete payments starting in March 2022. (FAC ¶ 39). Neither Plaintiff received any interest payments in April or May 2022, and payment in June 2022 was untimely and incomplete. (*Id.* ¶¶ 40-41). No payments were made after June 2022. (*Id.* ¶ 42). Plaintiffs issued a letter to Defendants on October 17, 2022, notifying Defendants of their failure to pay and setting a deadline for Defendants to cure the defect. (*Id.* ¶ 46). Hurt responded on October 27, 2022, promising to make all outstanding payments within two weeks. (*Id.* ¶ 47). When Defendants failed to make these payments, Plaintiffs notified Defendants that they were accelerating the debt and interest payments pursuant to the terms of the promissory notes. (*Id.* ¶ 49). Defendants did not respond to the notice of acceleration and have not paid Plaintiffs the amounts owed under the promissory notes. (*Id.* ¶ 50).

Plaintiffs allege that they were misled in making these investments by a "pitch deck" provided by Hurt. Hurt first showed Welter this pitch deck on September 27, 2019, and convinced Welter to invest in Caravan Corporation. (*Id.* ¶ 19). Hurt then provided the pitch deck to Stuart on December 3, 2021, just before Stuart invested in Caravan Corporation. (*Id.* ¶ 27). In the pitch deck, Defendants represented the following: (1) Caravan Corporation had purchased and financed the development of a 36.4-acre property in Santa Cruz, California; (2) Defendants had applied for and been approved for the necessary cultivation and processing licenses; (3) Defendants had already secured $10,000,000 in "Phase 1 Project Funding"; and (4) Caravan Corporation was budgeting $9,000,000 to expand its facilities. (*Id.* ¶ 51).

Plaintiffs assert that none of these representations was true at the time Plaintiffs made the loans. (*Id.*). Specifically, Plaintiffs allege, based on Hurt's deposition testimony, that Hurt did not own or control the Santa Cruz property, (*id.* ¶ 52); that there is no evidence that Defendants ever applied for or received the necessary licenses, (*id.* ¶ 56); that Caravan Corporation had received only verbal commitments and had not procured any actual

-3-

investment funds, (*id.* ¶ 61); and that Caravan Corporation never raised the money to expand its facilities, (*id.* ¶ 62). Plaintiffs allege that Defendants subsequently used investor funds, including those provided by Plaintiffs, to purchase the same Santa Cruz property that they had claimed to already own. (*Id.* ¶ 68). While Hurt disputed during his deposition that he had any interest in the Santa Cruz property, Plaintiffs allege that the property is currently owned by Caravan LLC as tenant in common with two other entities in which Hurt has an interest. (*Id.* ¶¶ 66-67).

The FAC asserts claims for breach of contract, breach of fiduciary duty, securities fraud, fraud, conversion, and receiving stolen property. (*Id.* at 13-20). Plaintiffs later dismissed their breach of fiduciary duty and one of the breach of contract claims. *See* (ECF No. 141 at 13-14). In the instant Motion, Plaintiffs seek to recover solely under the fraud, securities fraud, conversion, and receiving stolen property claims. *See* (Mot. at 7).

### B. Procedural History

Plaintiffs initiated this action in Los Angeles County Superior Court on March 9, 2023, alleging breach of contract, breach of fiduciary duty, and sale of an unregistered security. (ECF No. 1). Defendants removed the case to this Court on April 6, 2023. (*Id.*). Defendants filed a motion to dismiss on May 12, 2023, which the Court struck for failure to comply with Local Rules 6-1 and 7-4. (ECF No. 18). When Defendants subsequently failed to file any responsive pleading, Plaintiffs requested entry of default, (ECF No. 21), which the Clerk granted on June 8, 2023, (ECF No. 22). On Hurt's motion, the Court set aside default solely as to Hurt on August 4, 2023; as to the corporate defendants, the Court declined to set aside default because corporations are unable to appear pro se under the Local Rules of this District. (ECF No. 29). After initially failing to timely respond once again, resulting in a second entry of default by the Clerk, (ECF No. 32), Hurt filed an answer on September 6, 2023, (ECF No. 33), which the Court permitted in light of Hurt's representation that he did not receive notice of the Court's earlier order, (ECF No. 41).

Following a period of discovery, Plaintiffs moved for leave to file an amended complaint, which the Court granted on December 16, 2024. (ECF No. 99). Plaintiffs filed

1  the FAC on December 23, 2024, adding Caravan LLC as a defendant and asserting
2  additional claims for fraud, conversion, and receipt of stolen property.  (FAC at 18-20).
3  After Defendants failed to respond to the FAC, Plaintiffs again requested entry of default,
4  which the Clerk granted on February 28, 2025.  (ECF Nos. 110, 111, 116).  The parties
5  then stipulated to set aside default solely as to Hurt, which the Court granted on March 20,
6  2025.  (ECF No. 121).  Hurt filed a motion to dismiss the FAC on March 20, 2025, (ECF
7  No. 122).

8         On April 1, 2025, with Hurt's motion to dismiss pending before the Court,
9  Magistrate Judge Margo A. Rocconi issued a Report and Recommendation, recommending
10  that the Court impose evidentiary sanctions against Defendants.  (ECF No. 129).
11  Specifically, based on Hurt's destruction of Caravan Corporation's Google Workspace,
12  Judge Rocconi recommended that (1) Plaintiffs be permitted to present evidence to the jury
13  about Defendants' destruction of evidence; (2) the Court give an adverse inference
14  instruction at trial that the jury must presume that information in the Google Workspace
15  was unfavorable to Defendants; and (3) the Court must itself presume for purposes of any
16  pretrial, trial, or post-trial motions, that the Google Workspace contained information
17  unfavorable to Defendants. (*Id.* at 24-25).  While Judge Rocconi suggested that terminating
18  sanctions might be warranted, she stopped short of making such a recommendation in light
19  of the pending motion to dismiss and the policy in favor of addressing disputes on the
20  merits. (*Id.* at 19-23).

21        On May 27, 2025, the Court denied Hurt's motion to dismiss, (ECF No. 136), and,
22  the following day, accepted Judge Rocconi's Report and Recommendation in its entirety,
23  (ECF No. 137).  In the order denying Hurt's motion to dismiss, the Court instructed
24  Defendants to file an answer to the FAC, if any, within twenty-one days.  (*Id.* at 9).
25  Defendants did not answer the FAC within the deadline and have not subsequently filed an
26  answer.  On June 4, 2025, Plaintiffs filed their first round of pretrial filings and indicated
27  that Defendants had not participated in any of the joint filings. *See* (ECF Nos. 138-142).
28  On June 18, 2025, Plaintiffs filed their second round of pretrial filings, (ECF Nos. 144-

1  153), along with a request for entry of default against Hurt, (ECF No. 154).  On July 1,
2  2025, the Court vacated the final pretrial conference and other pending dates and instructed
3  the clerk to enter default, which the Clerk did.  (ECF Nos. 155-56).

4        Plaintiffs filed the instant Motion on September 2, 2025, seeking default judgment
5  against Defendants on the fraud, securities fraud, conversion, and receiving stolen property
6  claims.  (Mot. at 7).  As relief, Plaintiffs seek an award of $4,716,629.31, consisting of
7  $3,926,173.56 in treble damages under California Penal Code § 496(c), $500,000 in
8  emotional distress damages, and $290,455.75 in attorney's fees and costs.  (*Id.* at 30).  The
9  Motion is accompanied by declarations from Welter, (Welter Decl.), Stuart, (ECF No. 158-
10  2 ("Stuart Declaration")), and Plaintiff's Counsel, (ECF No. 158-1 ("Lowe Declaration").
11  On September 23, 2025, the Court issued a minute order granting Plaintiff leave to file a
12  supplemental declaration attesting to the facts required by Local Rule 55-1.  (ECF No.
13  159).  Plaintiff filed the supplemental declaration on September 26, 2025.  (ECF No. 160
14  ("Lowe Supplemental Declaration")).

15  **II.    LEGAL STANDARD**

16        Federal Rule of Civil Procedure 55(b) permits the Court to order default judgment
17  following the entry of default by the Clerk of Court.  Fed. R. Civ. P. 55(b).  After the Clerk
18  enters default, "well-pleaded factual allegations" in the complaint are accepted as true.
19  *DIRECTV, Inc. v. Huynh*, 503 F.3d 847, 854 (9th Cir. 2007) (citation omitted).  Allegations
20  as to damages, however, must be proven.  *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915,
21  917–18 (9th Cir. 1987).  To determine damages, a court may rely on declarations submitted
22  by the plaintiff or order a full evidentiary hearing.  Fed. R. Civ. P. 55(b)(2).  Additionally,
23  "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded
24  in the pleadings."  Fed. R. Civ. P. 54(c).

25        Before a court can enter a default judgment against a defendant, the plaintiff must
26  demonstrate it has complied with the procedural requirements set forth in Federal Rules
27  54(d) and 55, as well as those in Local Rule 55-1.  Local Rule 55-1 requires the party
28  moving for default judgment to submit a declaration establishing: (1) when and against

what party default was entered; (2) the pleading to which default was entered; (3) whether the defaulting party is a minor or incompetent person; (4) that the Servicemembers Civil Relief Act, 50 U.S.C. App. § 521, does not apply; and (5) that the defaulting party was properly served with notice, if required under Federal Rule 55(b)(2).  C.D. Cal. L.R. 55-1. If these procedural requirements are satisfied, a district court may, in its discretion, enter default judgment.  *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).

A defendant's default, however, "does not automatically entitle the plaintiff to a court-ordered judgment."  *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1174 (C.D. Cal. 2002).  Instead, the court, in its discretion, considers several factors, colloquially known as the "*Eitel* factors."  *Id.*  These factors "include: (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits."  *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986).

## III.    DISCUSSION

### A.    Jurisdiction and Service of Process

"When entry of judgment is sought against a party who has failed to plead or otherwise defend, a district court has an affirmative duty to look into its jurisdiction over both the subject matter and the parties."  *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999).  The Court will generally also consider whether there was sufficient service of process on the party against whom default judgment is requested.  *See Mason v. Genisco Tech. Corp.,* 960 F.2d 849, 851 (9th Cir. 1992).   The Court thus begins with an examination of its jurisdiction.

#### 1.    Subject Matter Jurisdiction

The Court finds that it has subject matter jurisdiction over the case because Plaintiff's securities fraud claim arises under federal law.  *See* (Mot. at 15 (relying on Securities and Exchange Act § 10(b) and Rule 10b-5)); 28 U.S.C. § 1331 ("The district

1  courts shall have original jurisdiction of all civil actions arising under the Constitution,

2  laws, or treaties of the United States."). Alternatively, the Court possesses diversity

3  jurisdiction over the case because there is complete diversity of citizenship and the amount

4  in controversy exceeds $75,000. *See* (FAC ¶¶ 2, 3, 5, 6 (alleging that Plaintiffs reside in

5  New Mexico and that Defendants are citizens of California, Nevada, and Wyoming); Mot.

6  at 30 (seeking a judgment of over $4,000,000)); 28 U.S.C. § 1332(a).

7                     2.    <u>Personal Jurisdiction</u>

8         The Court also has personal jurisdiction over Defendants. A court may exercise

9  general personal jurisdiction over a corporation that is fairly regarded as "at home" in the

10  forum state. *Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255, 262 (2017)

11  (citation omitted). A corporation is considered "at home" in both its "place of

12  incorporation and principal place of business." *Daimler AG v. Bauman*, 571 U.S. 117, 137

13  (2014). As alleged in the Complaint, Caravan Corporation has its principal place of

14  business in Los Angeles, California, and is therefore subject to general personal

15  jurisdiction. (FAC ¶ 3).

16         An individual, meanwhile, is "subject to general personal jurisdiction in her place of

17  domicile," *Ford Motor Co. v. Mont. Eighth Jud. Dist. Court*, 592 U.S. 351, 358-59 (2021),

18  defined as "her permanent home, where she resides with the intention to remain or to which

19  she intends to return," *Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001).

20  As alleged, Hurt resides in Los Angeles, California, and is therefore subject to general

21  personal jurisdiction in the state.[1] (FAC ¶ 6).

22         Finally, a court may exercise specific personal jurisdiction over a nonresident

23  defendant where the defendant has "'minimum contacts' with the relevant forum such that

24  the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial

25  justice.'" *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004)

26

---

27  [1] To the extent these allegations are insufficient to establish Hurt's domicile, the Court has

28  specific personal jurisdiction over Hurt for the same reasons discussed below as to Caravan
LLC.

1   (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The Ninth Circuit has
2   established three requirements for a district court to exercise specific personal jurisdiction
3   over a nonresident defendant: (1) the defendant must either "purposefully direct his
4   activities" toward the forum or "purposefully avail himself of the privileges of conducting
5   activities in the forum"; (2) "the claim must be one which arises out of or relates to the
6   defendant's forum-related activities"; and (3) "the exercise of jurisdiction must comport
7   with fair play and substantial justice, i.e. it must be reasonable." *Axiom Foods, Inc. v.*
8   *Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017) (citation and alterations omitted).
9   Plaintiff bears the burden of satisfying the first two prongs. *Schwarzenegger*, 374 F.3d at
10  802.

11          While Caravan LLC is a Wyoming limited liability company, and the FAC does not
12  identify its principal place of business, the Court has specific personal jurisdiction over the
13  company. As alleged in the FAC, Caravan LLC owns the Santa Cruz property that is one
14  of the subjects of this suit. (FAC ¶ 66). By purchasing property in California, Caravan
15  LLC purposefully availed itself of the privileges of conducting activities in this forum. The
16  FAC arises out of or relates to Caravan LLC's purchase of the Santa Cruz property because
17  Plaintiffs allege that the property was acquired using Plaintiffs' funds, which Plaintiffs
18  allege Defendants fraudulently procured by, in part, claiming that they already owned the
19  Santa Cruz property. Accordingly, the Court has personal jurisdiction over Caravan LLC
20  as to the claims asserted in the FAC.

21                    3.    Service of Process
22          From the record, it does not appear that Plaintiffs served a copy of the FAC and
23  summons on Defendants. Hurt previously raised this as a reason to set aside default, (ECF
24  No. 106), which the Court ultimately granted pursuant to a stipulation between the parties,
25  (ECF No. 121). Following the Court's order setting aside default, Hurt filed a motion to
26  dismiss the action, which did not raise any issue with personal jurisdiction or service. "A
27  general appearance or responsive pleading by a defendant that fails to dispute personal
28  jurisdiction will waive any defect in service." *Benny v. Pipes*, 799 F.2d 489, 492 (9th Cir.

1986).  Accordingly, Hurt waived any objection to service.  Moreover, given that the purpose of the rules on service is simply to "ensure[] that a party receives adequate notice of the litigation," *Walker & Zanger (West Coast) Ltd. v. Stone Design S.A.*, 4 F. Supp. 2d 931, 934 n.1 (C.D. Cal. 1997), the Court is additionally satisfied by the evidence in the record showing that Defendants are aware of this suit.  Accordingly, the Court finds that service is not a bar to entry of default judgment.[2]

## B.    Procedural Requirements for Default Judgment

To satisfy the procedural requirements for default judgment under Federal Rule of Civil Procedure 55(b) and Local Rule 55-1, the movant must submit a declaration specifying: (1) when and against what party default was entered; (2) the pleading to which default was entered; (3) whether the defaulting party is a minor or incompetent person; (4) that the Servicemembers Civil Relief Act, 50 U.S.C. App. § 521, does not apply; and (5) that the defaulting party was properly served with notice, if required under Federal Rule 55(b)(2).  C.D. Cal. L.R. 55-1.

In a supplemental declaration, Plaintiff's Counsel attests that default was entered as to the corporate defendants on February 28, 2025, and as to Hurt on July 1, 2025, (Supplemental Lowe Decl. ¶ 2); that the default was entered with respect to the First Amended Complaint, (*id.* ¶ 3); that the defaulting parties are not infants or incompetent persons, (*id.* ¶ 4); that the Servicemembers Civil Relief Act does not apply, (*id.* ¶ 5); and

---

[2] As to the corporate defendants, the Court notes that, although Plaintiffs appear to have served the initial complaint, because the FAC raises additional claims, Plaintiffs were also required to serve a copy of the FAC and summons pursuant to Federal Rule of Civil Procedure 5(a)(2).  However, because Hurt is a corporate officer of the corporate defendants, effective service on Hurt was sufficient to constitute service on the corporate defendants.  *See* Fed. R. Civ. P. 4(h)(1)(B).  Additionally, as discussed in greater detail below, the Court accepts Plaintiffs' alter ego theory as to the corporate defendants and finds that Hurt's appearance and waiver of any objection to service is sufficient to satisfy service of the corporate defendants.  *See Certified Bldg. Prods., Inc. v. NLRB*, 528 F.2d 968, 969 (9th Cir. 1979) (finding that because corporation was individual defendant's alter ego, "service upon the corporation is the equivalent of service upon the individual").

that notice of the Motion was served via First Class Mail and electronic transmission, (*id.* ¶ 6). This is sufficient to establish the procedural requirements for default judgment.

### C. *Eitel* Factors

Next, the Court considers the *Eitel* factors to guide its exercise of discretion as to the entry of default judgment. *See Eitel*, 782 F.2d at 1471-72.

#### 1. Possibility of Prejudice to Plaintiffs

Under the first *Eitel* factor, courts consider whether the plaintiff will experience prejudice in the absence of default judgment. *Id.* at 1471. Prejudice may be shown if denying default judgment would leave the plaintiff "without a proper remedy." *Landstar Ranger, Inc. v. Parth Enters., Inc.*, 725 F. Supp. 2d 916, 920 (C.D. Cal. 2010).

Here, while Defendants initially appeared and participated in the suit, they have not done so following the Court's denial of Hurt's motion to dismiss and acceptance of Judge Rocconi's Report and Recommendation. While Plaintiffs filed the required pretrial filings, Defendants did not file any pretrial documents jointly or otherwise, and a trial would be impracticable without participation by Defendants. Thus, in the absence of default judgment, Plaintiffs would be prejudiced because they would have no other means of recovery. *See Microsoft Corp. v. Nop*, 549 F. Supp. 2d 1233, 1236-37 (E.D. Cal. 2008) (finding plaintiff would be prejudiced absent default judgment because it would be left "without other recourse for recovery"). Accordingly, the first *Eitel* factor weighs in favor of granting default judgment.

#### 2. Substantive Merits of Plaintiffs' Claims and Sufficiency of Complaint

The second and third *Eitel* factors consider the substantive merits of the plaintiff's claims and the sufficiency of the complaint. *Eitel*, 782 F.2d at 1471. Taken together, these factors "require that a plaintiff state a claim on which it may recover." *Landstar Ranger*, 725 F. Supp. 2d at 920 (citation and brackets omitted). To weigh these two factors, the Court must evaluate the merits of Plaintiffs' claims. In the instant Motion, Plaintiffs seek judgment on their fraud, securities fraud, conversion, and receipt of stolen property claims. The Court will consider each of these claims in turn.

a) *Fraud*

Under California law, an action for fraud requires showing "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e. to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 974 (1997) (citation omitted).

Plaintiffs primarily rely on Defendants' alleged misrepresentations made in the pitch deck. Plaintiffs allege that the pitch deck represented that Defendants had purchased and financed the development of a 36.4 acre outdoor and greenhouse complex, that Defendants had applied for and been approved for the necessary cultivation and processing licenses, that they had secured $10,000,000 in phase 1 funding, and that they were budgeting $9,000,000 to expand the production facilities. (FAC ¶ 51). In fact, however, Plaintiffs allege that Defendants did not own the Santa Cruz property, had not received the necessary licenses, and had not secured the additional funding. (*Id.* ¶¶ 53, 55, 56). Plaintiffs further allege that Defendants misappropriated the investment funds to purchase the Santa Cruz property. (*Id.* ¶ 68).

Taking these allegations as true, Plaintiffs have stated a meritorious claim for fraudulent misrepresentation. Plaintiffs have identified several misrepresentations, including the statement in the pitch deck that Defendants already owned the Santa Cruz property that would be used for the business. Defendants' knowledge of the falsity of this statement can be inferred from the fact that Defendants did not own the property at the time the statement was made and that they subsequently purchased the property. The fact that these statements were made as part of a pitch deck to investors shows that Defendants intended to induce the reliance of investors with the false statements. Plaintiffs allege they relied on these statements in making their investments and that Plaintiffs' reliance was reasonable absent any reason to suspect Defendants' statements in the pitch deck were false. *See OCM Principal Opportunities Fund v. CIBC World Markets Corp.*, 157 Cal. App. 4th 835, 865 (2007) ("[A] plaintiff will be denied recovery only if his conduct is

manifestly unreasonable in the light of his own intelligence or information." (citation omitted)). Plaintiffs' lack of experience as private investors also contributes to the finding of reasonableness. *Hoffman v. 162 N. Wolfe LLC*, 228 Cal. App. 4th 1178, 1194 (2014) ("[A] plaintiff's particular knowledge and experience should be considered in determining whether the reliance upon the misrepresentation or nondisclosure was justified."); *see* (Welter Decl. ¶ 2; Stuart Decl. ¶ 2 (attesting to professional experience as a therapist and a wellness business owner)). Finally, Plaintiffs suffered resulting damage from the loss of their investment funds.

### b) *Securities Fraud*

To state a claim for securities fraud, Plaintiffs must allege "(1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Oregon Pub. Emp's Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 603 (9th Cir. 2014).

Most of these elements are similar to those discussed above with respect to the fraud claim. Taking Plaintiffs' allegations as true, Plaintiffs have identified several material misrepresentations regarding the state of Defendants' business. Defendants made these statements with knowledge of their falsity and with the intent of inducing Plaintiffs to invest in their business. Plaintiffs reasonably relied on these representations and made investments in Defendants' business. And Plaintiffs' reliance on the statements caused the loss of the investment funds. Thus, Plaintiffs appear to have a facially valid securities fraud claim.

However, the Court must additionally determine whether the promissory notes at issue here qualify as securities subject to regulation under the securities laws.[3] The statute

---

[3] Section 10(b) prohibits "any manipulative or deceptive device or contrivance" made "in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered." 15 U.S.C. § 78j(b). Thus, the fact that the note here does not relate to any national securities exchange is not dispositive.

1    "begins with the open-ended language that '[t]he term 'security' means any note.'" *SEC*

2    *v. Wallenbrock*, 313 F.3d 532, 536 (9th Cir. 2002) (quoting 15 U.S.C. § 78c(a)(10)).

3    However, "[t]he presumption that a promissory note is a security . . . is rebuttable." *Id.*

4    (citing *Reves v. Ernst & Young*, 494 U.S. 56, 65 (1990)).  In making this determination,

5    courts first inquire "whether the promissory note bears a 'family resemblance' to a

6    judicially-created list of non-security instruments," and then, if not, "determine whether

7    the note is a type that should be added to the list." *Id.* at 536-37 (quoting *Reves*, 494 U.S.

8    at 67)).  In making this inquiry, courts examine four factors: "(1) the 'motivations that

9    would prompt a reasonable seller and buyer to enter into' the transaction; (2) the 'plan of

10   distribution' of the instrument; (3) the 'reasonable expectations of the investing public';

11   and (4) 'whether some factor such as the existence of another regulatory scheme

12   significantly reduces the risk of the instrument.'"  *Id.* at 537 (quoting *Reves*, 404 U.S. at

13   66-67).

14       Applying this test, the Court concludes that the promissory notes at issue here qualify

15   as securities.  The promissory notes do not resemble any of the notes identified as non-

16   securities.  *See Exch. Nat'l Bank of Chi. v. Touche Ross & Co.*, 544 F.2d 1126, 1138 (2d

17   Cir. 1976) (listing as examples, "the note delivered in consumer financing, the note secured

18   by a mortgage on a home, the short-term note secured by a lien on a small business or some

19   of its assets, the note evidencing a 'character' loan to a bank customer, short-term notes

20   secured by an assignment of accounts receivable, or a note which simply formalizes an

21   open-account debt incurred in the ordinary course of business").  The Court is unaware of

22   any reason why the promissory note here would be of a type that should be added to this

23   list.  The term of maturity of the note is also two years, in excess of the nine-month

24   exception listed in the statutory definition of security.  *See* 15 U.S.C. § 78c(a)(10).

25       The *Reves* factors support this conclusion.  First, Plaintiffs attest that their motivation

26   for the transaction was to generate investment returns over the length of the two-year

27   period, *see* (Stuart Decl. ¶ 5), and Defendants' purpose for seeking the loan appears to have

28   been to raise money to develop their business.  *See Reves*, 494 U.S. at 66 (a note is more

akin to a security "[i]f the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate"). Second, while there is little information in the record about whether the notes were "offered and sold to a broad segment of the public," *id.* at 68, Defendants' pitch deck implies that they solicited investments from a number of investors, as do the allegations about Defendants raising and spending $9,000,000 on the Santa Cruz property. *See* (FAC ¶ 68). Third, a reasonable investor sending money to Defendants in exchange for a 14% annual return over a two-year period "would expect that the funds were an investment, not a short-term loan." *Wallenbrock*, 313 F.3d at 539. Finally, the Court is unaware of any risk-reducing factors that would indicate that the notes are not securities. Accordingly, the Court finds that the promissory notes qualify as securities and that Plaintiffs have stated a meritorious claim for securities fraud.

### c) Conversion

The elements of a conversion claim under California law are "(1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by wrongful act inconsistent with the property rights of the plaintiff; and (3) damages." *In re Emery*, 317 F.3d 1064, 1069 (9th Cir. 2003). Conversion is a strict liability tort and "[q]uestions of good faith, lack of knowledge, and motive are ordinarily immaterial." *Id.*

Plaintiffs have stated a meritorious claim of conversion. First, they owned the $1,000,000 that was loaned to Defendants and had a contractual right to repayment of the principal with interest. Second, Defendants converted the investment funds as part of the purchase of the Santa Cruz property. The conversion was wrongful because Defendants had represented to Plaintiffs that they already owned the Santa Cruz Property, already possessed certain required licenses, and would use the money to develop their production facilities. Third, Plaintiffs suffered damages because Defendants did not make the required interest or principal payments under the contract.

1

2

*d)*    *Receipt of Stolen Property*

Finally, under California Penal Code § 496(c), "[a]ny person who has been injured by a violation of subdivision (a) or (b) may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees." To show a violation of section 496(a), a plaintiff must show that "(i) property was stolen or obtained in a manner constituting theft, (ii) the defendant knew the property was so stolen or obtained, and (iii) the defendant received or had possession of the stolen property." *Switzer v. Wood*, 35 Cal. App. 5th 116, 126 (2019).

Taking Plaintiffs' allegations as true, Plaintiffs have a meritorious claim here as well. First, Defendants' actions constitute theft under the statute. While some California courts previously expressed skepticism that the civil action in § 496(c) was intended to encompass merely fraudulent activity, the California Supreme Court recently settled this issue, concluding that "[a] plaintiff may recover treble damages and attorney's fees . . . when property has been obtained in any manner constituting theft." *Siry Inv., L.P. v. Farkhondehpour*, 13 Cal. 5th 333, 361 (2022). Under California Penal Code § 484(a), "theft" is defined to include "knowingly and designedly, by any false or fraudulent representation or pretense, defraud[ing] any other person of money, labor or real or personal property." Thus, § 496(c) includes actions premised on "theft by false pretense." *Bell v. Feibush*, 212 Cal. App. 4th 1041, 1048 (2013); *see Siry Inv.*, 13 Cal. 5th at 361 ("[W]e agree with the conclusion[] of *Bell* . . . that section 496(c) is unambiguous, and that read together with sections 496(a) and 484 . . . section 496(c) must be understood as yielding the understanding attributed to it in [that] decision[]."). As discussed above, Plaintiffs have adequately alleged that Defendants knowingly, by false representations, defrauded Plaintiffs of money.[4] Second, because Defendants knowingly made the false

---

[4] The California Supreme Court in *Siry Investment* noted that "not all commercial or consumer disputes alleging that a defendant obtained money or property through fraud, misrepresentation, or breach of a contractual promise will amount to theft" because a plaintiff must establish "criminal intent on the part of the defendant beyond mere proof of nonperformance or actual falsity." *Siry Inv.*, 13 Cal. 5th at 361-62 (internal quotation

1  representations that resulted in Plaintiffs making the investments, Defendants necessarily
2  knew that they had obtained the investment funds through fraudulent means.   Third,
3  Defendants possessed the fraudulently obtained investment funds and later possessed real
4  property acquired using those funds.  This is sufficient to establish a claim for receipt of
5  stolen property under California law.

6  3.    Sum of Money at Stake

7  The fourth *Eitel* factor considers "the amount of money at stake in relation to the
8  seriousness of the Defendant's conduct." *PepsiCo*, 238 F. Supp. 2d at 1176.  "This requires
9  that the court assess whether the recovery sought is proportional to the harm caused by
10  defendant's conduct." *Landstar Ranger*, 725 F. Supp. 2d at 921.  When the amount at stake
11  is substantial or unreasonable in light of the allegations in the complaint, default judgment
12  is disfavored. *See Eitel*, 782 F.2d at 1472.  However, default judgment may be appropriate
13  "where the amount sought is tailored to the specific misconduct of the defendant."
14  *Patagonia, Inc. v. McHugh*, No. LA CV19-cv-07666 JAK (AFMx), 2020 WL 4258818, at
15  *5 (C.D. Cal. Apr. 21, 2020).

16  Plaintiffs seek to recover $4,716,629.31, consisting of $3,926,173.56 in treble
17  damages, $500,000 in emotional distress damages, and $290,455.75 in attorney's fees and
18  costs.  As discussed below, the Court finds that Plaintiffs' claim for emotional distress
19  damages is excessive.   Otherwise, the Court finds that the remaining damages are
20  proportional to the harm.   The actual damages of $1,308,724.52 are based on the
21  $1,000,000 invested, plus interest, and the treble damages are mandated based on the
22  meritorious receiving stolen property claim.  Accordingly, this factor weighs in favor of
23  default judgment.

25  marks and citation omitted).  To the extent this requirement is not already met based on the
26  discussion of scienter above, the Court finds that this intent can be inferred based on
27  Defendants' intentional destruction of corporate records in the course of this litigation and
   the mandatory adverse inference adopted by the Court pursuant to Judge Rocconi's Report
28  and Recommendation.

### 4.    Possibility of a Dispute Regarding Material Facts

"The fifth *Eitel* factor examines the likelihood of disputes between the parties regarding the material facts surrounding the case." *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1060 (N.D. Cal. 2010).  There is little room for dispute here. Plaintiffs deposed Hurt in this case, and he made numerous conflicting statements but admitted that he lacked any records to show that Defendants applied for the necessary licenses or that he had previously acquired the Santa Cruz Property.  (FAC ¶¶ 54-55). Plaintiffs also have put forth records showing that Defendants acquired the Santa Cruz property on February 3, 2023.  (*Id.* ¶ 66).  To the extent there are disputes about Caravan Corporation's corporate records, the Court is also required to make adverse inferences based on the evidentiary sanctions imposed against Defendants.  Moreover, Defendants had the opportunity to contest the material facts when they appeared and defended this action, and they have waived that opportunity by ceasing their defense of this case. Accordingly, the Court finds that this factor weighs in favor of default judgment.

### 5.    Possibility of Excusable Neglect

The sixth *Eitel* factor considers whether the default was due to excusable neglect. *Eitel*, 782 F.2d at 1472.  "This factor favors a default judgment when the defendant has been properly served or the plaintiff demonstrates that the defendant is aware of the lawsuit." *Zlozower v. Women.com, Inc.*, No. 2:22-cv-03856-JLS-JC, 2023 WL 3432249, at *4 (C.D. Cal. Mar. 13, 2023).

There is no possibility of excusable neglect here.  Defendants are well aware of this suit, having answered Plaintiffs' initial complaint, removed the case to federal court, participated in discovery, and filed a motion to dismiss Plaintiff's FAC.  Defendants stopped responding only after the Court denied the motion to dismiss and accepted Judge Rocconi's recommendation of evidentiary sanctions.  Given that Defendants are aware of this suit and have had every opportunity to defend themselves, the possibility of excusable neglect is remote, and this factor favors default judgment.  *See Joelson v. WorldWide Recoveries, LLC*, No. SA CV 10-867 DOC (MLGx), 2011 WL 13225055, at *3 (C.D. Cal.

Mar. 28, 2011) (finding sixth *Eitel* factor favored default judgment where service was proper and a representative of the defendant had been in touch with the plaintiff).

### 6.    Policy Favoring Decision on the Merits

The final *Eitel* factor recognizes that "[c]ases should be decided upon their merits whenever possible." *Eitel*, 782 F.2d at 1472.  However, where a defendant fails to answer the complaint, a decision on the merits is "impractical, if not impossible." *PepsiCo*, 238 F. Supp. 2d at 1177.  While this factor weighs against entry of a default judgment, it "does not preclude a court from granting default judgment." *Id.* (citation omitted).  Weighing all seven of the *Eitel* factors, the Court finds that default judgment is warranted, notwithstanding the general preference for deciding cases on the merits.

### D.    Remedies

As relief for Defendants' actions, Plaintiffs seek the following remedies: (1) $3,926,173.56 in treble damages, based on $1,308,724.52 in actual damages; (2) $500,000 in emotional distress damages; (3) $290,455.75 in attorney's fees and litigation costs; and (4) a finding of joint and several liability.  The Court will consider each category of relief in turn.

#### 1.    Actual and Treble Damages

First, Plaintiffs claim that their actual damages amount to $1,308,724.52, based on the $1,000,000 investment plus interest.  In calculating interest, Plaintiffs argue that one of Stuart's loans qualifies for an exception to California's usury laws and should accrue interest at the 14% rate stated in the parties' contract.  As to the remaining investment funds, Plaintiffs concede that under California law, the maximum applicable interest rate is 10%.  Using these numbers, Plaintiffs calculate a total of $468,558.11 in accrued interest since the date of the loans, minus the $130,667.60 previously paid in interest, for a total of $308,724.52 in interest.

The Court agrees with Plaintiffs' calculation of actual damages.  First, Plaintiffs have shown that they invested a total of $1,000,000, that they were contractually entitled to recover this amount, and that Defendants never repaid these funds.  While Welter did

convert $50,000 of one of the promissory notes into equity in Caravan Corporation, the Court accepts Welter's attestation that he never received any equity or documentation of this interest, such that Plaintiffs should be entitled to recover this amount as well. (Welter Decl. ¶ 6). As to interest, the Court agrees that California's usury laws generally cap the applicable interest rate at 10%. *See* Cal. Const., Art. XV, § 1(2) (capping interest "[f]or any loan or forbearance of any money, goods, or things in action for any use other than [for personal, family, or household purposes], at a rate not exceeding the higher of (a) 10 percent per annum or (b) 5 percent per annum plus" the Federal Reserve Bank of San Francisco's discount rate). The Court also agrees that Stuart's $300,000 investment is subject to a statutory exception and may accrue interest at the 14% rate specified in the parties' contract. *See* Cal. Corp. Code § 25118(b)(1) (exempting loans of at least $300,000 from the usury provisions of the California Constitution). Finally, the Court agrees with Plaintiffs' proposed method of calculating the total accrued interest.

Next, Plaintiffs argue that they are entitled to three times the amount of actual damages based on their receiving stolen property claim. Under California Penal Code § 496(c), "[a]ny person who has been injured by a violation of subdivision (a) or (b) may bring an action for three times the amount of actual damages." As discussed above, "[a] plaintiff may recover treble damages . . . under section 496(c) when property has been obtained in any manner constituting theft," *Siry Inv.*, 13 Cal. 5th at 361, including "theft by false pretense," *Bell*, 212 Cal. App. 4th at 1048 (citing Cal. Penal Code § 484(a)). While the California Supreme Court acknowledged potential criticism of this approach, it left it to "the Legislature to address those policy concerns." *Siry Inv.*, 13 Cal. 5th at 367 (citation omitted). Absent any legislative change, the Court must apply the plain language of § 496(c) and conclude that Plaintiffs are entitled to treble damages on their receiving stolen property claim. Because there is "[n]o double recovery," *Bell*, 212 Cal. App. 4th at 1049, Plaintiffs may recover a total of $3,926,173.56 on their claims.

2.    <u>Emotional Distress</u>

Plaintiffs next argue that they should be entitled to recover additional damages for emotional distress. (Mot. at 25). Plaintiffs each attest to suffering sleepless nights, anxiety, and lasting stress as a result of the alleged fraud committed against them. *See* (Welter Decl. ¶¶ 9-12; Stuart Decl. ¶¶ 7-10). Plaintiffs assert that a total of $500,000 in emotional distress damages would adequately compensate Plaintiffs for this injury.

The Court agrees that Plaintiffs are entitled to recover damages for emotional distress. While damages on default judgment may not exceed those demanded in the pleadings, Fed. R. Civ. P. 54(c), Plaintiffs sought to recover for emotional distress in connection with their conversion and fraud claims. (FAC ¶¶ 107, 113). California courts recognize the possibility of recovering emotional distress damages for both types of claims, at least where the alleged conduct is intentional. *See Gonzalez v. Personal Storage, Inc.*, 56 Cal. App. 4th 464, 477 (1997) ("[D]amages for emotional distress growing out of a defendant's conversion of personal property are recoverable."); *Branch v. Homefed Bank*, 6 Cal. App. 4th 793, 799 (1992) (finding that "the critical analysis" in determining whether emotional damages are recoverable in fraud claims is whether "the tort is either intentional or negligent"). Plaintiffs' claims of insomnia, anxiety, and stress are the types of harms that may be recovered as emotional distress damages. *See Wong v. Jing*, 189 Cal. App. 4th 1354, 1376 (2010) (citation omitted) ("[E]motional distress may consist of any highly unpleasant mental reaction such as fright, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment or worry."). And while Plaintiffs have not provided much corroborating information, the attestations of ongoing stress and self-doubt are sufficient to show that the injury is "substantial or enduring as distinguished from trivial or transitory." *Young v. Bank of America*, 141 Cal. App. 3d 108, 114 (1983).

However, the Court finds Plaintiffs' request of $500,000 to be excessive. "The amount and severity of damages for emotional distress is a question of fact for the [finder of fact] to decide based on all the evidence before it." *Abelson v. Nat'l Union Fire Ins. Co.*, 28 Cal. App. 4th 776, 789 (1994) (citation omitted). Plaintiffs have put forth only

their own attestations of emotional harm, not medical testimony or corroborating witness testimony.  On default judgment, other California district courts have typically awarded far less than the request here for similar fraud claims.  *See, e.g.*, *Hernandez v. Madrigal*, CIV. No. S-09-0413 MCE GGH, 2011 WL 6936364, at *4 (E.D. Cal. Dec. 30, 2011) (awarding $75,000 in emotional distress damages based on claim of fraudulent equity stripping scheme and noting that "[c]ases awarding damages for emotional distress of this type have awarded a wide range, from $5,000 to $125,000"); *Schroeder v. Hundley*, No. 17-CV-919-JLS (JMA), 2021 WL 4934980, at *4 (S.D. Cal. Aug. 9, 2021) (awarding $100,001 for emotional distress resulting from fraud that caused plaintiff to file for bankruptcy, suffer a lien on her home, and borrow money to meet basic needs); *Brantley v. Boyd*, No. C 07-6139 MMC, 2013 WL 3766911, at *9 (N.D. Cal. July 16, 2013) (awarding $75,000 based on fraudulent conversion of loan causing foreclosure and 5 years of mental anguish); *Keehan v. United Law Grp., Inc.*, No. 10-CV-00484-IEG (WVG), 2010 WL 11508959, at *6 (S.D. Cal. June 23, 2010) (awarding $30,000 because plaintiff was able to avoid foreclosure and did not suffer "more severe manifestations of her emotional distress" beyond anxiety and worry).

Having reviewed this case law and "[g]iven that [Plaintiffs] never sought treatment for [their] distress; that the distress was not debilitating; and the [Plaintiffs have] failed to cite any authority for the appropriate amount of emotional distress damages," *McMenemy v. Colonial First Lending Grp.*, Inc., No. 2:14-cv-001482-JAM-AC, 2016 WL 4382696 (E.D. Cal. Aug. 17, 2016), the Court finds that $50,000—$25,000 per Plaintiff—is an appropriate award of emotional distress damages.  Such an award is within the range of awards typically granted in similar cases and is more commensurate with the harm demonstrated by Plaintiffs.

### 3.    Attorney's Fees and Costs

Because Plaintiffs have prevailed on their receipt of stolen property claim, they are entitled to recover reasonable attorney's fees and costs of suit.  Cal. Penal Code § 496(c). In this District, Local Rule 55-3 sets a schedule for the recovery of attorney's fees in default

judgment actions where an applicable statute allows for such recovery. *See* C.D. Cal. L.R. 55-3. For an award over $100,000, courts calculate attorney's fees as $5600, plus 2% of the amount over $100,000. *Id.* As reduced by the Court, the total damages award here is $3,976,173.56. Applying the formula from the Local Rules, this would amount to $83,123.47 in attorney's fees ($5600 + 0.02 x (3,976,173.56 – 100,000)).

Plaintiffs instead seek an award of $269,039 in attorney's fees, based on a lodestar analysis of the number of hours spent working on this case, multiplied by Counsel's ordinary hourly rate. (Mot. at 26). Plaintiffs have provided a detailed accounting of the hours spent on this case and the rates charged for those hours. (ECF No. 158-1 at 5-111). According to these figures, Plaintiffs' Counsel spent approximately 862.3 hours on this case across nearly three years of litigation. Plaintiffs' Counsel charged rates between $190 to $600 dollars for services by different attorneys on the case.

Local Rule 55-3 permits the Court to grant a deviation from the fee schedule as it "deem[s] reasonable." C.D. Cal. L.R. 55-3. The Ninth Circuit has interpreted this provision to mean that, when a party seeks a fee in excess of the schedule, "the court is obliged to calculate a 'reasonable' fee in the usual manner, without using the fee schedule as a starting point." *Vogel v. Harbor Plaza Ctr., LLC*, 893 F.3d 1152, 1159 (9th Cir. 2018). In calculating a reasonable attorney's fee award under the lodestar method, courts multiply "the number of hours *reasonably* expended on the litigation by a *reasonable* hourly rate." *Costa v. Comm'r of Soc. Sec. Admin.*, 690 F.3d 1132, 1135 (9th Cir. 2012) (emphasis added) (citation and alterations omitted).

Applying the lodestar method, the Court is persuaded that the requested attorney's fees are reasonable. From the Court's experience, Plaintiffs' requested hourly rates of $600 for a partner and $190 - $400 for associates are within the range of normal rates in this District in the area of business litigation. And while Plaintiffs' Counsel has spent an extraordinary number of hours on this case, the number is reasonable in light of the length of the case and the disputes that have arisen throughout the litigation. Plaintiffs first brought this case in October 2022, approximately three years ago. Since that time,

1  Plaintiffs have gone through discovery, engaged in depositions, briefed multiple rounds of
2  motions, including a motion to dismiss, motion for sanctions, and the instant motion, and
3  prepared a full set of pretrial filings.  In the unredacted copy of Plaintiffs' Counsel's billing
4  records provided to the Court, Plaintiffs' Counsel provides a detailed account of how these
5  hours were spent.  In the absence of contrary argument from Defendants, the Court will not
6  second-guess the reasonableness of these hours.  Accordingly, the Court finds that the
7  request is reasonable and awards $269,039 in attorney's fees.

8          Plaintiffs are also entitled to recover costs under California Penal Code § 496(c).
9  Plaintiffs have provided detailed accounting of the costs incurred in this case, including e-
10 filing fees, service costs, research database fees, transcripts, and deposition costs.  (ECF
11 No. 158-1).  The Court finds these costs to be reasonable and awards the requested amount
12 of $21,416.75.

13              4.    Joint and Several Liability

14         Finally, Plaintiffs request that Defendants be held jointly and severally liable for all
15 damages under a theory of alter ego liability.  To establish alter ego liability under
16 California law, a plaintiff must show (1) "that there is such unity of interest and ownership
17 that the separate personalities no longer exist"; and (2) "that failure to disregard their
18 separate identities would result in fraud or injustice."  *Am. Tel. & Tel. Co. v. Compagnie*
19 *Bruxelles Lambert*, 94 F.3d 586, 591 (9th Cir. 1996).

20         The Court agrees that, on this record, Caravan Corporation and Caravan LLC can be
21 properly characterized as alter egos of Hurt.  In the FAC, which the Court must take as true
22 for purposes of this Motion, Plaintiffs allege that "the business affairs and activities of each
23 of the Defendants were and are so intermingled as to constitute one single business
24 enterprise conducted by, between, and among them," and that Hurt exercises total control
25 over the corporations.  (FAC ¶ 12).  As Judge Rocconi previously found in her Report and
26 Recommendation, Hurt served as CEO and owned 91.25% of Caravan Corporation's
27 shares.  (ECF No. 129 at 10).  While he previously claimed to have sold these shares, he
28 could not produce any evidence of having done so.  (*Id.*).  The Court accepted Judge

Rocconi's Report and Recommendation, which requires the Court to make adverse inferences against Defendant as to the contents of Caravan Corporation's corporate records. Thus, the Court finds several relevant factors to alter ego liability are present, including "[c]ommingling of funds and other assets," "the identical equitable ownership in the two entities," and "sole ownership of all of the stock in a corporation by one individual." *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal. App. 3d 825, 839-40 (1962).

The FAC also alleges that Caravan Corporation was "undercapitalized," that it siphoned off money from investors for use by Caravan LLC to acquire the Santa Cruz property, and that Hurt then represented that Caravan Corporation was out of business in an attempt to avoid liability. (FAC ¶ 15). These allegations support a finding of other relevant factors to alter ego liability, including "contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability," "use of a corporation as a subterfuge of illegal transactions," and "manipulation of assets and liabilities between entities so as to concentrate the assets in one and liabilities in another." *Associated Vendors, Inc.*, 210 Cal. App. 3d at 840. Thus, the Court finds that that there is such unity of interest and ownership among Defendants that the separate personalities no longer exist.

The Court also finds that failure to disregard the separate identities of the corporate defendants would result in fraud or injustice. Hurt is alleged to have solicited investor funds to Caravan Corporation using fraudulent claims, moved those investor funds to Caravan LLC to purchase real property for his personal use, and then disclaim liability because Caravan Corporation no longer has funds. Recognizing the separate corporate identities of Caravan Corporation and Caravan LLC would therefore work an injustice because it would allow Hurt to retain the benefits of his fraudulent scheme while claiming that he lacks the ability to pay. Accordingly, based on a finding of alter ego liability, the Court orders that Defendants be held jointly and severally liable for the damages awarded in this Order.

**IV.    CONCLUSION**

For the foregoing reasons, the Court GRANTS the Motion. Consistent with this Order, Plaintiffs are entitled to recover $3,926,173.56 in compensatory and treble damages, $50,000 in emotional distress damages, $269,039 in attorney's fees, and $21,416.75 in costs, for a total of $4,266,629.31. Within fourteen (14) days of this Order, Plaintiffs shall submit a proposed judgment consistent with this Order. *See* C.D. Cal. L.R. 58-11; Fed. R. Civ. P. 58.

**IT IS SO ORDERED.**

DATED:  October 28, 2025

HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE